SPARTON CORPORATION, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 92–580C.

United States Court of Federal Claims.

Aug. 4, 2003.

Steven Kreiss, of Washington, D.C., for Plaintiff.

Gary L. Hausken, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for Defendant, with whom were Vito J. DiPietro, Director; and Robert D. McCallum, Jr., Assistant Attorney General.

## OPINION

DAMICH, Chief Judge.

On October 3, 1997, Defendant filed a Motion for Summary Judgment on the Issue of Invalidity, wherein Defendant asserted that Plaintiff, Sparton Corporation ("Sparton"), could not recover under 28 U.S.C. § 1498(a) because Sparton's patents numbered 3,921,-120 ("the '120 patent") and 4,029,233 ("the '233 patent") are invalid under 35 U.S.C. § 102(b). In opposition, Sparton contends that experimental use negates the statutory bar of section 102(b). Moreover, Sparton claims that the patented inventions were not offered for sale prior to the critical date. Two oral arguments have been held on Defendant's motion and it is ready for the Court's decision.[1] For the reasons stated below, the Court GRANTS Defendant's Motion for Summary Judgment on the Issue of Invalidity. The Court finds the device at issue was offered for sale more than one year prior to the critical date. The experimental use exception does not save Sparton's patents because the sale of the device at issue was primarily for commercial, not experimental, purposes. The reasons for the Court's decision follow.

## I. BACKGROUND

The two patents at issue, the '120 and '233 patents were filed on March 29, 1973. Plaintiff is the assignee of both the '120 and '233 patents. Defendant contends that both patents are invalid based on the on sale bar found at 35 U.S.C. § 102(b). Section 102(b) provides:

A person shall be entitled to a patent unless—

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States[.]

35 U.S.C. § 102(b) (2000). For purposes of section 102(b), the critical date, the date one year prior to the filing date, is March 29, 1972; for Defendant to prevail, it must show that the patented inventions were on sale prior to the critical date.

---

1. Transcript I (hereinafter "Tr. I") refers to the transcript of oral argument conducted by Judge Merow on October 26, 2000. The second transcript refers to the oral argument held on January 9, 2003 (hereinafter "Tr. II").

The device at issue is the AN/SSQ–53 sonobuoy, which is an underwater electroacoustic device used to detect, locate and classify the source of underwater sounds, such as those generated by submarines. U.S. Pat. No. 3,921,120, col. 1, ll. 11–13. Sonobuoy devices are also used for other underwater geographical exploration. *Id.* The claimed inventions make up a sonobuoy deployment system that is designed to drop into the water from an air or marine craft. U.S. Pat. No. 3,921,120, col. 1, ll. 19–27. The '120 patent describes a sonobuoy deployment system where components of the buoy are deployed from its upper end allowing the casing of the buoy to sink and the components to be deployed to considerable depths without damage from impact. U.S. Pat. No. 3,921,-120, col. 2, ll. 11–15, 27–38. The '233 patent describes a sonobuoy retainer or release plate that is part of the sonobuoy design. The release plate enables the release of the sonobuoy's components from the casing of the buoy. U.S. Pat. No. 4,029, 233, col. 1–2, 4.

## A. Facts

The alleged barring activity occurred between September 1970 and March 9, 1972. In September 1969, the Navy awarded Contract N00019–69–C–0465 (" '0465 Contract") to Sparton; the '0465 Contract was based on Navy solicitation 0019–69–R–0075. The subject of the '0465 Contract was the procurement of the AN/SSQ–53 sonobuoy (or "SSQ–53 sonobuoy"). Def.'s Ex. 3 at A26. The SSQ–53 sonobuoy is a DIFAR sonobuoy.[2] The SSQ–53 sonobuoy, initially sold under the '0465 Contract, entered the water vertically. The buoy's components left the housing from its lower end and the buoy did not have the capability of operating at both deep and shallow depths. The buoy's limitations on depth and problems with the deployment system design, which often damaged the buoy's component parts, resulted in the development of the patented invention.

### 1. *Development of the Patented Invention*

Because the Navy had expressed interest in buoys with the capacity to operate at deep and shallow depths, the Navy granted an Engineering Change Proposal (or "ECP") to three sonobuoy contractors, including Sparton, to produce such a buoy. Sparton, through James W. Widenhofer, the inventor of the devices described in '120 and '233 patents, conceived an idea for rapidly deploying the AN/SSQ–53 DIFAR sonobuoy to deep depths using an inverse deployment design ("dual depth design"), which was unique because all production buoys up to that time "routinely deployed their components from the bottom end of the sonobuoy." Pl.'s Opp. at 5. Thereafter, Sparton began to develop and test the dual depth design. By September 1970, Sparton began to work on the dual depth design and it proposed a schedule for constructing and testing the sonobuoys; twenty sonobuoys were to be constructed by February 28, 1971 and then tested by March 7, 1971. By December 1970, Mr. Widenhofer proposed a test program, which would evaluate the sonobuoy's dual depth design, "with particular reference to the float activated release plate design," and other "areas of interest," such as "air deployment and subsequent descent with parachute" and "deployment of the various subsurface components." Def.'s Ex. 9 at A201. On December 8, 1970, Mr. Widenhofer prepared notes regarding the "patent information on a float pressure activated release plate mechanism." Def.'s Ex. 10 at A206. Mr. Widenhofer's notes include sketches. *Id.* at A207.

Testing began of the preliminary mechanical design on December 19, 1970. Six sonobuoy test units were dropped with Navy assistance from Key West, Florida; only 4 buoys were reported to have "performed as intended," with difficulties noted. Def.'s Ex. 11 at A209. A second test was performed on February 18, 1971; its purpose was "[t]o evaluate the present mechanical and electrical designs prior to constructing a final engi-

---

2. DIFAR stands for the Directional Frequency Analysis and Recording. Def.'s SOF ¶5; Pl.'s

SOF ¶5 (Def.'s Ex. A105–A108).

neering lot of [20] sonobuoys intended to demonstrate an acceptable design for a deep DIFAR." Def.'s Ex. 12 at A213. Mr. Widenhofer reported that "[t]he principles involved in the operation of the inverse sonobuoy design with a float pressure activated release mechanism or the so called 'upside down' design, have been proven workable and, within the limited scope of the testing accomplished to date, reliable," Def.'s Ex. 12 at A214; however, there were problems with the cable spool on several units. The cable broke on several buoys deployed.

Additional testing of the sonobuoy deployment device was conducted to solve the cable break problem. Pl.'s Ex. B104. Mr. Widenhofer proposed a test program; a test was conducted on April 1, 1971, Def.'s Ex. 14 at A235, and a Final Report was prepared by Mr. Widenhofer on June 21, 1971. Widenhofer reported that the deep DIFAR program had been completed and he set out to describe the final mechanical design of the deep DIFAR sonobuoy. Def.'s 16 Ex. A257.

### 2. The Engineering Change Proposal and Modification

Sparton submitted an ECP, dated March 17, 1971, in connection with the '0465 Contract, which inter alia, proposed to incorporate dual depth operating capability into the existing AN/SSQ–53 sonobuoy design. Def.'s Ex. 5 at A182, Def.'s Ex. 6. The ECP includes a description of the dual depth sonobuoy deployment design, which includes drawings. Def.'s Ex. 6.

Sparton proposed under the ECP that the work be completed in two phases. Phase One was the design and construction of the engineering models and performance of the sea tests. Def.'s Ex. 6 at A195. Phase One required the government to furnish 35 AN/SSQ–53 sonobuoys; these buoys were those already supplied to the government by Sparton under the existing contract. The Navy was to supply aircraft and support facilities for conducting the testing under Phase One. Id. Phase Two was the modification and delivery of the 300 sonobuoys designed for dual depth operation. Id. The 300 completed AN/SSQ–53 sonobuoys were to be modified in accordance with the proposal and submitted for future "test and evaluation" by the Navy. Def.'s Ex. 6 at A183. Sparton was to provide the Navy with one operating manual teaching the operation of the buoys. Def.'s Ex. 6 at 195. Sparton proposed modifying the '0465 Contract for a fixed price of $198,000. Def.'s Ex. 5.

A Modification P00004 to the '0465 Contract ("Modification 4 or Mod. 4") was made on July 13, 1971, in response to the ECP. Under the modification, Sparton was required to "incorporate into the 335 units of the subject sonobuoys the selectable depths of 90 feet or 1000 feet as delineated in the Engineering Change Proposal ...." Def.'s Ex. 3 at A22. In accordance with Mod. 4, the 335 sonobuoys were "shipped in place" in August 1971, which meant they were considered "shipped" even though they remained at the plant. Def.'s Ex. 4 Boyle Depo. at 252. ("[W]hen the product is at the stage deemed completed in the manufacturer's plant, there would be a shipping paper prepared that says these units have been shipped, and they aren't moved but they're considered shipped."). Testing under Mod. 4 began immediately on August 31, 1971; ten buoys were tested, with 8 reported as deploying normally. Pl.'s Ex. at B158.

### 3. The Development of the Widenhofer Release Plate

On July 20, 1971, a meeting was held to discuss the work plan for providing the 300 dual depth sonobuoys under the ECP. Def.'s Ex. 20 at A271. One area marked for mechanical redesign was the release plate, which was to be "simplified." Def.'s Ex. 20 at A272. The stated goal was to produce "a reliable Dual Depth DIFAR design capable of being produced economically in large quantities—the goal being necessarily subject to budget limitations." Def.'s Ex. 31 at 350. There is evidence of the improved release plate's conception in the record before the critical date, but after the alleged offer for sale. See e.g., Pl's Ex. 33 at 175, Def.'s Ex. 24. James Widenhofer's notes dated December 8, 1970, describe a "patent information on a float pressure activated release plate mechanism," but the parties agree that actual conception was not until October 1971

when a drawing provided a layout drawing of the release plate. Def.'s Ex. 10 at A205; Def.'s Ex. 24. A November 5, 1971 Air Drop Test (Def.'s Ex. 25), tested the performance of the proposed dual depth DIFAR sonobuoy design, including Mr. Widenhofer's single part float pressure activated release plate design ("Widenhofer release plate" or "single part release plate"). Def.'s Ex. 25. The purpose of the test, as reported by Mr. Widenhofer, was "[t]o evaluate the performance of the proposed dual depth DIFAR sonobuoy package with particular reference to the new single part float pressure activated release plate design." *Id.* Other features, such as the parachute release, were also tested and evaluated. *Id.* Out of the 4 buoys tested, the improved release plate functioned normally in only 2 buoys; nevertheless, the single part release plate was deemed "acceptable for further evaluation without modification." Def.'s Ex. 25 at A301. A second drawing titled "plate, release" appears on or about November 31, 1971, initialed by Mr. Widenhofer; the drawing was a "C"-sized drawing 900–4623, which was the second drawing of the release plate produced. Def.'s Ex. 26; Def.'s Ex. 4 at A160–61.

4. *Further Testing Under Phase One of the Contract*

Further testing of the deep DIFAR design was conducted in November 1971, January 1972, February 1972, and March 1972. On January 13, 1972, an air drop test (Def.'s Ex. 27) was conducted in St. Croix with Navy assistance. The purpose of the test was to evaluate the dual depth design prior to commitment to final design. Def.'s Ex. 27. The sonobuoys tested contained the new Widenhofer release plate. The only major problem observed during this test was a loss of electronic audio signal on 5 out of 6 deep buoys. Def.'s Ex. 27. As Plaintiff points out, parts comprising the upside-down deployment design malfunctioned, but there was no mention of malfunction in connection with the release plate. Pl.'s SOF 77; Def.'s Ex. 27. On February 9, 1972, another Air Drop Test was performed, which also tested the Widenhofer release plate. Def.'s Ex. 28 at A316, A320. There were malfunctions reported. *Id.* at A320. On February 10, 1972, an "over-the-

side" test was performed by dropping the buoy into the ocean from a boat. Some malfunctions were reported. Def.'s Ex. 28 at A320. Later that month, on February 28, 1972, a meeting was conducted to discuss the status of the duel depth units to be delivered under the contract. Def.'s Ex. 29 at A342. A record of this meeting shows that the Sparton engineering department was to begin work with the Sparton operations department on March 6, 1972, to provide first piece samples of the device. *Id.* Sparton anticipated delivery to begin in April. *Id.*

On March 9, 1972, an air drop test was performed on 10 sonobuoys, which was the final test of the deep DIFAR design. The sonobuoys tested included the Widenhofer release plate. The purpose of the March 9, 1972, test was "[t]o evaluate the overall performance parameters of the sonobuoy design prior to final design release for the 300 deliverable sonobuoys." Def.'s Ex. 30 at A343. Mr. Widenhofer thereafter reported that "this was a very successful field test" and "[t]here was no recurrance [sic] of any problem previously encountered." Def.'s Ex. 30 at A343. Mr. Widenhofer also reported that Navy personnel, Graff and Mellis, observed the tests and were satisfied with the performance of the buoys. Def.'s Ex. 30 at A343. Mr. Widenhofer's report stated that this test "concludes the engineering test phase of the Dual Depth DIFAR Program." *Id.* Mr. Widenhofer's follow-up report, dated April 28, 1972, again indicates that the March 9, 1972 test was the basis for releasing the design for production of the 300 deliverable sonobuoys. Def.'s Ex. 31 at A372. In this same report, Widenhofer concluded that "[t]he basic design concepts have been shown, within the limitation of the engineering evaluation, to be reliable and producible. *No changes of the basic design concepts are required to improve the reliability or producibility* [sic]." Def.'s Ex. 31 at A375 (emphasis added). Mr. Widenhofer noted that "[t]here are several instances related to problem areas where improvements should be made." *Id.* Nevertheless, the existing design was said to be "inexpensive and reliable." *Id.* According to Mr. Widenhofer's report, Sparton expected to complete the 300

buoys under the ECP by May 19, 1972. Drawing 900–4709 of the single part release plate and a sketch illustrating the deployment sequence was included in Widenhofer's report.[3] Def.'s Ex. 31 at A354. By the critical date, however, production drawings of the sonobuoys did not exist. Boyle Decl. at 797. The final production design had not been finalized until after the critical date. Pl.'s Ex. 156, Boyle Decl. at B797.

### 5. Delivery of the SSQ–53 sonobuoys under the contract

On April 25, 1972, the Navy received a shipment of 100 dual depth sonobuoys produced under the ECP/Mod. 4. Def.'s Ex. 37. The ECP sonobuoys were shipped to the attention of a Mr. Graff, an electronic engineer at the Navy Air Warfare Center, who distributed the buoys to various Navy squadrons; the buoys were to be tested along the standard AN/SSQ–53 sonobuoys. The Navy evaluation plan was prepared and carried out by Navy employees, who compared the performance of the buoys in certain conditions; testing included buoys made by Sparton's competitors, Magnavox, and Sanders. Def.'s Ex. 38 at A458–59, A463. Sparton only received unofficial feedback from the Navy with regard to the reliability of the sonobuoys, if something went wrong with their performance. Def.'s Ex. 38 at A487–A488. Mr. Graff received a second shipment of 160 ECP sonobuoys on June 13, 1972; these buoys were tested by the Navy under its evaluation plan. The additional sonobuoys produced by Sparton under the ECP/Mod. 4 were delivered to a Naval Air Station at Key West, Florida on June 9, 1972, and also were tested under the evaluation plan. Def.'s Ex. 38 at A476, A478; Def.'s Ex. 41 at A515. Although the Navy testing of Sparton's design produced satisfactory results, it did not result in Mr. Graff recommending one contractor's buoys over the other. Def.'s Ex. 38 at A468, A490.

Sparton requested an equitable adjustment for completing the work under the ECP and Mod. 4 in a letter dated October 22, 1971.

Def.'s Ex. 32. Modification P00009 to the '0465 Contract was issued on May 2, 1972, which paid Sparton an additional $96,000 for work performed under the ECP. Modification P00011 authorized a total adjustment to Sparton in the amount of $282,000 for work performed under the '0465 Contract. Def.'s Ex. 3 at A16 ("This supplemental agreement increases the total amount of the contract by $282,000.00 and sets forth the complete equitable adjustment for incorporation of Change Orders P00004 and P00009 for the modification of AN/SSQ–53 sonobuoys for dual depth."). Henry Melvin, a Sparton employee familiar with its sonobuoy contracts and financial system, attests that Sparton incurred a loss on the project. Melvin Decl. at 1, 4.

### 6. Sparton's Administrative Claim

Sparton submitted an administrative claim to the Navy on February 11, 1981, requesting compensation for the unlicensed use of its inventions claimed in the '120 and '233 patents. In connection with this administrative claim, there was a plethora of correspondence exchanged concerning the potential statutory bar of the patents at issue, with various references to the dates of conception and reduction to practice of the inventions described in the '120 and '233 patents. In a letter dated April 15, 1982, Sparton conceded that the ECP "includes many details of patent number 3,921,120." Id. Nevertheless, Sparton did not agree that the ECP constituted an offer for sale of the patented invention because the ECP did not show "the release plate or any of its details so, therefore, [the ECP] did not offer 'for sale' the features of patent 4,029, 233." Def.'s Ex. 48 at A540. On July 2, 1981, Sparton informed the Navy that the '120 and '233 patents had a conception date of September 1970, and a reduction to practice date of February 18, 1971. Def.'s Ex. 44. Later Sparton corrected itself. Def.'s Ex. 52. On February 27, 1992, Sparton said, with respect to the '120 patent, the conception date of September 1970 was correct, Def.'s Ex. 52 at A628, but the reduction to practice date appeared to be "at least as early as the test on March 9,

---

**3.** Sparton's Director of Operations (Jackson, Michigan plant), Charles Boyle, attests that 900 series drawings are engineering-type drawings, while 100 series drawings are production-type drawings. Boyle Decl. at Pl.'s App.797.

1972 which is reported in Sparton report 'Job 7400–Dual Depth DIFAR Final Report' by J. Widenhofer dated April 28, 1972 . . . ." Def.'s Ex. 52 at A628. With respect to the '233 patent, Sparton reported a conception date of August 1971 to October 1971 and the first reduction to practice on March 9, 1972. Def.'s Ex. 52 at A628–A629. Again Sparton corrected itself in a letter dated August 7, 1992, stating the reduction to practice of both patents occurred after July 12, 1972. Def.'s Ex. 53.

## B. The '120 Patent

### 1. The Deployment System

The '120 patent describes the deployment sequence of the dual depth sonobuoy.[4] As stated *supra*, objectives of the invention are, *inter alia*, "to provide an improved sonobuoy

4. The patent application was filed on March 29, 1973, and was issued November 18, 1975.

5. Claim 1 reads:

1. A sonobuoy component deployment system comprising, in combination, a nonbouyant [sic] casing having an open upper end and a permanently closed lower end, signal receiving and transmitting apparatus within said casing slidably removable therefrom through said upper end thereof, inflatable float means mounted in said casing adjacent said upper end slidably removable from said casing and located intermediate said casting upper end and said signal receiving and transmitting apparatus, flexible cable means connecting said apparatus to said float means of a length determining the operating depth of said apparatus, releasable retaining means mounted on said casing adjacent said upper end and intermediate said upper end and said float means retaining said float means and apparatus with said casing and permitting said float means and apparatus to deploy from said casing upper end upon said retaining means releasing from said casing, said inflatable float means being located adjacent said retaining means on the opposite side thereof with respect to said casing upper end, float inflating means within said casing for inflating said float means upon said casing being immersed, inflation of said float means releasing said retaining means from said casing wherein release of said retaining means from said casing permits said casing to fall below said float means and deploy said apparatus from said casing upper end at the operating depth of said apparatus.

Claim 7 provides:

component deployment system wherein the sonobuoy components may be quickly deployed to considerable depths." U.S. Pat. No. 3,921,120, col. 2, ll 11–15. The deployment design has the ability to deploy a sonobuoy's components quickly at predetermined depths while protecting its components from impact. U.S. Pat. No. 3,921,120, col. 2, ll 21–38. Defendant claims that the ECP was a "definite offer to sell the upside-down deployment system of claims 1, 7, and 8 prior to the critical date." Def.'s Mot. for Summ. J. at 23. Claims 1 and 7 are independent claims, while claim 8 is dependent.[5]

### 2. The Release Plate

Another objective of the invention described in the '120 patent is to provide a release plate for the sonobuoy allowing the buoy's nonbuoyant casing to rapidly sink

7. A sonobuoy component deployment system comprising, in combination, a nonbouyant [sic] cylindrical casing having a substantially uniform diameter throughout its length, an open upper end, and a permanently closed lower end, signal receiving and transmitting apparatus removably housed within said casing slidably removable therefrom through said upper end thereof, inflatable float means removably mounted in said casing adjacent said upper end between said upper end and said apparatus, flexible cable means connecting said apparatus to said float means of a length determining the operating depth of said apparatus, retaining means releasably mounted on said casing adjacent said upper end retaining said float means and said apparatus in said casing and releasing said float means from said casing upon said casing being immersed, said inflatable float means being located adjacent said retaining means on the opposite side thereof with respect to said casing upper end, float inflating means within said casing for inflating said float means, casing immersion sensing means energizing said inflating means upon said casing being immersed, inflation of said float means releasing said retaining means and said float means from said casing wherein release of said float means from said casing permits said casing to fall below said float means and deploy said apparatus from said casing upper end at the operating depth of said apparatus.

Claim 8 reads:

8. In a sonobuoy component deployment system as in claim 7, a ballast weight mounted upon said casing adjacent said lower end.

from its components when they reach their predetermined depths. U.S. Pat. No. 3,921,120, col. 2, ll. 21–32. The casing essentially protects the components until they reach their desired depths. U.S. Pat. No. 3,921,120, col. 2, ll. 27–32. The function of the release plate mechanism is to "maintai[n] the sonobuoy components within the sonobuoy casing" and to simultaneously serve as the "air velocity restraining anchor or connecting member for the casing." *Id.* at col. 2, ll. 39–44. The release of the restraining plate simultaneously releases the sonobuoy's parachute, and allows the buoy's components to be deployed through the buoy's upper end as it sinks through the water. *Id.* at col. 2, ll. 44–48. Defendant contends the release plate sold under the ECP "embodies the release plate recited by claims 2–6 of the '120 patent and 1–3 of the '233 patent." Claims 2–6 of the '120 are dependent claims and are reproduced below.[6] Defendant has provided claim charts, which allegedly demonstrate that each element or limitation can be found in various documents cited by Defendant, including the first and second drawing of the release plate, drawings 900–4623, and 900–4709, and Mr. Widenhofer's final report dated April 28, 1972. Def.'s Mot. for Summ. J. at 19–23, 31–32.

### C. The '233 Patent

The '233 patent describes the single part restraining plate used in the deployment sequence of Sparton's dual depth sonobuoy deployment design.[7] U.S. Pat. No. 4,029,233. Claims 1–3 of the '233 patent are reproduced below.[8] Claim 1 is the only independent claim.

## II. DISCUSSION

The on sale bar provision found at 35 U.S.C. § 102(b) will invalidate a patent offered for sale more than one year prior to the critical date. The Supreme Court held in *Pfaff v. Wells Electronics*, that "the on-sale bar applies when two conditions are satisfied before the critical date. First, the product must be the subject of a commercial offer for sale .... Second, the invention must be ready for patenting." 525 U.S. 55, 67, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998). Although reduction to practice of the invention is always sufficient to satisfy the second condition, a reduction to practice is not necessary. For example, drawings that embody the invention are sufficient to demonstrate that the invention offered for sale is "ready for patenting." *Id.*

Nevertheless, a patent is presumed valid, and Defendant must prove invalidity by "clear and convincing evidence or its equivalent, by whatever form of words it may be expressed." *Buildex Inc. v. Kason Indust., Inc.*, 849 F.2d 1461, 1463 (Fed.Cir.1988) (cita-

---

**6.** Claim 2 provides:

2. In a sonobuoy component deployment system as in claim I wherein said retaining means comprises a deformable substantially flat plate having a periphery, and locking tabs outwardly projecting from said periphery received within openings defined in said casing, inflation of said inflatable float means deforming said plate and withdrawing said tabs from the associated casing openings.

Claim 3 reads:

3. In a sonobuoy component deployment system as in claim 2 wherein said deformable plate includes a weakened hinge line defined thereon intermediate said locking tabs to facilitate and control deformation of said plate.

Claim 4 reads:

4. In a sonobuoy component deployment system as in claim 3 wherein said hinge line comprises at least one elongated opening diametrically defined in said plate, the length of said opening being substantially perpendicular to a diameter interconnecting said locking tabs.

Claim 5 reads:

5. In a sonobuoy component deployment system as in claim 2, parachute anchor means defined on said plate, and a parachute anchored to said anchor means for retarding the rate of descent of said casing while falling through the atmosphere and released from said casing upon said plate releasing from said casing.

Claim 6 reads:

6. In a sonobuoy component deployment system as in claim 5 wherein said anchor means are located on said plate adjacent said plate periphery and said locking tabs.

**7.** The application for the '233 patent was filed on September 12, 1975, and was issued June 14, 1977.

**8.** *See* Part II.G. *infra.*

tions omitted). Since both the '120 and '233 patents at issue here are presumed valid, 35 U.S.C. § 282, the Court must not hold them invalid haphazardly without regard to whether each limitation of the claimed invention is the subject of the offer for sale. *Dana Corp. v. American Axle & Mfg., Inc.*, 279 F.3d 1372, 1376 (Fed.Cir.2002).

Whether a product was placed on sale by the inventor or assignee is a question of law based on underlying facts. *Weatherchem Corp. v. J.L. Clark, Inc.*, 163 F.3d 1326, 1332 (Fed.Cir.1998). Unmistakably, the commercial offer for sale must be of the claimed invention. The Federal Circuit explained in *Scaltech, Inc. v. Retec/Tetra, LLC*, 269 F.3d 1321, 1328 (Fed.Cir.2001) ("*Scaltech III* "), that the first inquiry in the on sale bar analysis is whether there has been a commercial offer for sale of the invention; this test has two "sub-parts," which are (1) has a commercial offer for sale occurred, and (2) is it a sale of the claimed invention. The Federal Circuit counseled that "the invention that is the subject matter of the offer for sale must satisfy each claim limitation of the patent, though it may do so inherently." *Id.* at 1329 (citing *Scaltech, Inc. v. Retec/Tetra, LLC*, 178 F.3d 1378, 1383–84 (Fed.Cir.1999) ("*Scaltech II* ")).

## A. The Standard for Granting a Motion for Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact, and thus the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Secretary, DHHS*, 998 F.2d 979, 982 (Fed.Cir.1993). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses ...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. After adequate time for discovery and on motion, summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, where that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. 2548. The Court must resolve any doubts about factual issues in favor of the non-moving party, *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1307 (Fed.Cir.1998), and draw all reasonable inferences in its favor. *See Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed.Cir.1995).

The Court finds summary judgment to be appropriate in the present case because no genuine issues of material fact preclude it. Although Plaintiff argues that several factual disputes in the record make this case inappropriate for summary judgment, the Court disagrees.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. Nevertheless, there is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim[s]." *Id.* Although Defendant has not filed affidavits in connection with his motion, the Court finds that Defendant has met its burden based on the undisputed evidence in the record. For example, the parties do not dispute that Sparton's original sonobuoy deployment design proposed in the ECP, and the modification thereto, did not include a release plate meeting the description of the release plate limitation of the claimed inventions. Pl.'s Supp. Brief at 3; Def.'s Supp. Brief at 2, 3. Moreover, the ECP and Mod. 4 clearly indicate Sparton's obligations under the contract. Likewise, the parties do not dispute the testing that was conducted by Sparton with Navy assistance under Mod. 4 or the general results of those tests.

Once Defendant has met its burden of coming forward with evidence showing that

no material issue of fact precludes summary judgment, the burden shifts to Sparton to establish that Defendant is not entitled to judgment. Sparton could accomplish this by demonstrating that there are issues that require a resolution by this Court at trial. *Vivid Technologies, Inc. v. American Sci. and Eng'g, Inc.,* 200 F.3d 795, 806–07 (Fed. Cir.1999). Plaintiff argues that under *Dana Corp. v. American Axle & Mfg., Inc.,* 279 F.3d 1372, 1375 (Fed.Cir.2002), summary judgment is inappropriate because the Court must construe any disputed claim language before considering whether the offer or sale can be construed to encompass the patented invention. Since the Government has said that for purposes of summary judgment, it is adopting Plaintiff's claim construction, there are no disputed limitations for the Court to construe. Tr. II at 39–40. Def.'s Reply Br. at 2, 5 (citing claim charts submitted with Sparton's pretrial submissions), 7. Defendant has said that even if the Court were to construe the claims as Plaintiff would like it to, the patented invention as described in the claims was on sale and ready for patenting prior to the critical date. Therefore, the Court agrees with Defendant; it may consider Defendant's motion without a claim construction hearing.

No other genuine issues of fact prevent the Court from resolving this case on summary judgment. Plaintiff argues that the lack of bearing data in connection with the March 9, 1972 test creates a triable issue of fact, but the Court disagrees. Mr. Charles Boyle, who is an engineer employed by Sparton for over 40 years, attests that bearing data is "important" information that helps determine whether the electronic components of the sonobuoy are performing properly during and subsequent to deployment. Boyle Decl. at ¶ 15. Mr. Boyle explains in his declaration that "a deployment system, if not working properly, can adversely affect the performance of the electronic parts within the sonobuoy." *Id.* Plaintiff contends that Defendant has failed to show that the tests were properly reviewed prior to the test date, and thus a genuine issue of fact exists. *Id.* at 32–33 (citing *Estee Lauder Inc. v. L'Oreal,* 129 F.3d 588, 592–93 (Fed.Cir.1997)).

The Court finds Plaintiff's reasoning flawed. In *Estee Lauder,* the Federal Circuit held that "when testing is necessary to establish utility, there must be recognition and appreciation that the tests were successful for reduction to practice to occur." *Estee Lauder,* 129 F.3d at 593, 594–95; *see also Genentech, Inc. v. Chiron Corp.,* 220 F.3d 1345, 1352–53 (Fed.Cir.2000)(discussing *Estee Lauder*). *Estee Lauder* dealt with the reduction to practice of an invention involving a chemical composition for protecting skin from exposure to UV light. Given the chemical nature of the invention, testing was required to establish that the invention was useful. Estee Lauder could not establish reduction to practice of the invention even though necessary testing was conducted because the inventor did not review the test results before the critical date and thereby determine that the invention succeeded for its intended purpose. *Estee Lauder,* 129 F.3d at 594–95.

*Estee Lauder* does not help Sparton. Aside from the fact that the inventions at issue do not involve chemical compositions, there is no allegation that utility has not been established. Rather, the inquiry is whether the tests showed that the dual depth sonobuoy deployment system worked for its intended purpose, as Defendant argues it did. *Scott v. Finney,* 34 F.3d 1058, 1061 (Fed.Cir. 1994) ("To show reduction to practice, the junior party must demonstrate that the invention is 'suitable for its intended purpose' … the embodiment relied upon as evidence of priority must actually work for its intended purpose."). Furthermore, it is clear from the record that Mr. Widenhofer adequately considered the results of the March 9 test and prepared a report subsequent to the test, wherein he concluded that the inventions worked for their intended purpose based on the bearing data available to him. Widenhofer not only considered bearing data, which appeared to be good with respect to "all buoys except channels 7 & 15," Def.'s App. 30 at A345, he considered the condition of all 10 buoys that were air dropped on March 9, which is apparent from the detailed memorandum describing the test results and the attached failure analysis reports. Def.'s Ex. 30 at A343–349. Thereafter Widenhofer con-

tinues to describe the March 9 test as "highly successful." Def.'s Ex. 31 at 351. Widenhofer's final report, dated April 28, 1972, indicates "The Engineering Development Phase of ECP 0465-2 was completed on March 9, 1972, with highly successful airdrop of *ten final design buoys*." *Id.* (emphasis added). Thus, the facts indicated that Widenhofer was certain that his inventions worked as of March 9, 1972, even though, as Sparton points out, the computer print-out of the bearing data had not arrived. Based on the existing bearing data and results of this testing alone, Widenhofer was so confident in his deployment design that he released the design "for production of the 300 deliverable buoys" sold under the ECP. Def.'s Ex. 31 at A372. Furthermore, as Defendant points out, bearing data was not a requirement of the claimed inventions and that only the claimed invention "need be reduced to practice." Def.'s Reply at 7 (citing *Brasseler, USA I, LP v. Stryker Sales Corp.*, 182 F.3d 888 (Fed.Cir.1999); *RCA Corp. v. Data Gen. Corp.*, 887 F.2d 1056, 1061 (Fed.Cir.1989)).

In short, Defendant met its burden in demonstrating that no genuine issue would preclude summary judgment. Sparton simply has not established that any material issue of fact requires a resolution at trial, thus summary judgment is appropriate. *Vivid Technologies, Inc.*, 200 F.3d at 806–07.

## B. The Commercial Offer for Sale

■ Whether a commercial offer for sale or sale has occurred depends on traditional contract law principles. "[T]he offer must meet the level of an offer for sale in the contract sense, one that would be understood as such in the commercial community." *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1046 (Fed.Cir.2001); *Linear Tech. Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1048 (Fed.Cir.2001) (recognizing the overruling of *RCA Corp. v. Data Gen. Corp.*, 887 F.2d 1056 (Fed.Cir.1989)). "Only an offer

which rises to the level of a commercial offer for sale, one which the other could make into a binding contract by simple acceptance (assuming consideration), constitutes an offer for sale under § 102(b)." *Group One Ltd.*, 254 F.3d at 1048. The Uniform Commercial Code ("UCC") and general principles of common law are used as guides to determine whether an offer for sale has occurred. *Id.* at 1047–48. Although the UCC does not govern the transactions between Sparton and the Navy,[9] the Federal Circuit has found that the UCC "provides useful guidance in applying general contract principles." *Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060, 1066 (Fed.Cir.2001). In *Linear Technology*, the Federal Circuit said that it "will search for the common denominator for assistance in crafting the federal common law of contract that now governs the on-sale bar." *Linear Technology*, 275 F.3d at 1048.

In the present case, the alleged offer for sale occurred on March 17, 1971, when Sparton submitted an Engineering Change Proposal to the Navy which, *inter alia*, proposed to incorporate dual depth operating capability. Def.'s Ex. 5, A182. Modification 4 to the '0465 Contract was adopted on July 13, 1971, in response to the ECP. Under the modification, Sparton was required to "incorporate into the 335 units of the subject sonobuoys the selectable depths of 90 feet or 1000 feet as delineated in the Engineering Change Proposal . . . ." Def.'s Ex. 3 at A22.

Defendant argues that Mod. 4 was the acceptance of the offer and sale of the sonobuoys, which Defendant argues is a commercial contract, rather than an experimental one. Defendant contends that when the Navy accepted the ECP on July 13, 1971, "Sparton committed itself to a commercial sale of 300 sonobuoys." Def.'s Supp. Br. at 7. Defendant argues that under *Special Devices, Inc. v. OEA, Inc.*, 270 F.3d 1353 (Fed. Cir.2001), and *Zacharin v. United States*, 213

---

9. *See e.g., Technical Assistance Int'l v. United States*, 150 F.3d 1369, 1372 (Fed.Cir.1998) (declining to apply the UCC to a requirements contract between the government and a contractor because it is not binding with respect to government contracts). "Congress has not applied the Uniform Commercial Code to federal contracts."

*GAF Corp. v. United States*, 932 F.2d 947, 951 (Fed.Cir.1991), *cert. denied*, 502 U.S. 1071, 112 S.Ct. 965, 117 L.Ed.2d 131 (1992) (no warranty of merchantability and fitness applicable to a sales contract between a government contractor and a government entity).

F.3d 1366 (Fed.Cir.2000), the use of the sonobuoys by the Navy for testing makes the '0465 Contract a commercial sale because a developmental contract is a commercial contract. In *Special Devices*, the Federal Circuit said that a developmental contract with the government constituted a "commercial sale," which it found clear from the precedent set forth in *Zacharin, Special Devices*, 270 F.3d at 1357. *Zacharin* is similar to the case at bar. It involved a research and development contract entered into with the Army when there was no restriction on the Army's use of the invention. *Zacharin v. United States*, 213 F.3d at 1370. The facts differ somewhat, however. There was no fixed price set for the invention, and the invention was already reduced to practice. *Id.* The question considered by the Federal Circuit was whether the research and development contract was a commercial contract. The Federal Circuit found that although it was a R & D contract and there was no fixed price for the device, it constituted a commercial contract for purposes of the on sale bar. *Zacharin*, 213 F.3d at 1370. The Court gave little credence to the fact that products sold to the Army were to be used for testing rather then as "routine production units." *Id.* The Court said "[a] contract to supply goods is a sales contract ... regardless of whether the goods are to be used for testing in a laboratory or for deployment in the field." *Id.*

Moreover, Defendant says each sonobuoy delivered pursuant to Mod. 4 thereafter, including the 35 sonobuoys set aside for sea tests, was a delivery and sale of the sonobuoys.[10] Def.'s Supp. Br. at 9. The Government relies on general contract law principles set forth in the UCC and Restatement Second of Contracts.[11] Arguing that the 35 sonobuoys used for engineering sea tests were deliveries and sales under the '0465 Contract is significant because the sea tests occurred prior to the critical date, thus easily establishing an on sale bar. Defendant contends that "[t]he Navy accepted the performance of Sparton under the contract and, accordingly, Sparton's duty was fully discharged by production of the 335 sonobuoys with new release plates." Def.'s Supp. Br. at 9 (citing Restatement (Second) of Contracts § 278). The Government argues that each delivery of the sonobuoys under Phase One of the contract was a sale and delivery of the goods under Restatement (Second) of Contracts § 278. Defendant points to language in the contract concerning air drop test samples that it contends supports its argument. The provision states that a delivery of a lot of sonobuoys "will be considered to have been made ... as of the date that lot is presented to the cognizant Contract Administrative Office for Air Drop Test Sampling ...." Def.'s Ex. 3 at A46. The Government also points to language dealing with a defective sample lot sonobuoy, stating that "[a] sample lot sonobuoy that fails drop testing but is part of a sample lot that passes such testing, may be given gratis to the Contractor at the option of the Government ... Giving of such a sonobuoy to the contractor shall have no effect on the contract quality." Def.'s Ex. 3 at A43, Def.'s Supp. Br. at 10. Defendant argues that

---

10. The Court notes that there is some dispute as to the number of sonobuoys used for Phase One sea tests, which were conducted in accordance with the ECP. Plaintiff says that only 20 buoys were used, while the Government points to 39. The Court finds the number immaterial. Mod. 4 required Sparton to provide 335 sonobuoys to the Navy. As the Government points out, there has been no indication in the record that Sparton had not met its obligation under Phase One of the contract. Tr. II at 52.

11. Plaintiff argues that government contract law principles should apply in determining whether the '0465 Contract can be construed to encompass the patented inventions, however, Plaintiff offers no principles of government contract law, such as those set forth in the Federal Acquisition Regulation (FAR), or Armed Services Procurement Act, 10 U.S.C. § 2302 *et seq.* (ASPA) that guide the interpretation of the contract at issue. Moreover, in *Linear Tech.*, the Federal Circuit has said that it will "search for the common denominator" when "crafting the federal common law of contract that now governs the on-sale bar." *Linear Tech. Corp.*, 275 F.3d at 1048. This language, as the Government suggests, counsels against having different rules for the Government and the private sector. Tr. II at 43. Moreover, the Federal Circuit finds useful guidance in the UCC, which it has said assists in the understanding of general contract law principles. *Hughes Communications Galaxy, Inc.*, 271 F.3d at 1066. There is nothing to suggest that those general principles do not apply here.

these provisions demonstrate that sonobuoys used in the air drop tests prior to the critical date were deliveries under the contract, and demonstrate that the Government exercised "complete dominion" over the buoys used in the tests. Def.'s Supp. Br. at 10. The Government contends that the 300 sonobuoys were also on sale prior to the critical date, pointing out that production of the assemblies for the sonobuoys were completed, and "Sparton certainly had chosen to fulfill its obligation under the contract by delivering sonobuoys that embody the invention." Def.'s Supp. Br. at 11.

Plaintiff disputes that the '0465 Contract, as modified, was a commercial contract, and argues rather that the 300 sonobuoys produced under the ECP were for testing and evaluation purposes, and were never to be construed as production sonobuoys. *See e.g.,* Boyle Decl. ¶ 7, 8; [12] Melvin Decl. at ¶ 4; Martin Decl. at ¶ 3. Plaintiff maintains that the activity under the contract was experimental in nature. Furthermore, Plaintiff contends that it cannot be construed to encompass the patented inventions because the '0465 Contract was never modified to include the release plate limitation of the claimed inventions. Plaintiff asserts that conception of the patented release plate did not occur until after Mod. 4 was adopted, and this fact is not disputed by Defendant for purposes of summary judgment. Plaintiff says that since the Mod. 4 and '0465 Contract were never amended to include the release plate, the "delivery" of the 300 sonobuoys to the Navy after the critical date "does not retroactively change the subject matter of ECP 0465–2/Mod. 4 prior to the critical date" in light of *Envirotech Corp. v. Westech Eng'g Inc.,* 904 F.2d 1571 (Fed.Cir.1990) and *Tec Air Inc.,* 192 F.3d 1353 (Fed.Cir.1999). Pl.'s Supp. Br. at 4. Plaintiff says that in both *Envirotech Corp.* and *Tec Air, Inc.,* "shipments of the claimed invention subsequent to the critical date were held not to change the nonclaimed subject matter of the alleged offer/sale prior to the critical date." Pl.'s Supp. Br. at 4.

As a threshold matter, the Federal Circuit's opinion in *Zacharin,* 213 F.3d 1366, supports Defendant's contention that this is a commercial contract. Although the Court will address Plaintiff's experimental use defense more completely below, the sale in question appears commercial in nature even though Sparton did not sell production sonobuoys to the Navy. In accordance with *Zacharin,* the sonobuoys sold to the Navy for testing and evaluation purposes do not necessarily shield them from the on sale bar of 35 U.S.C. § 102(b). *Zacharin,* 213 F.3d at 1370. Nevertheless, this case can be distinguished from *Zacharin* because the parties disagree as to whether the inventions had been reduced to practice, or ready for patenting prior to the critical date, and whether the patented inventions were embodied in the offer for sale. Those issues shall be addressed below.

The Court does not find support in the record, however, for the proposition that the 35 sonobuoys used for testing prior to the critical date were deliveries under the contract. Contrary to Defendant's contentions, the plain language of the contract does not support Defendant's legal argument. Mod. 4 provides that Sparton was to "incorporate into the 335 units of the subject sonobuoys the selectable depth of 90 feet or 1000 feet as delineated in Engineering Change Proposal No. 0465–2 ...." Def.'s Ex. 3 at A22. The ECP provides that Sparton will "[m]odify and deliver one production lot of *300* GFE AN/SSQ–53 Sonobuoys for dual depth operation" and an operating manual. Def.'s Ex. 6 at A195 (emphasis added). The ECP states that the 35 sonobuoys were to be used in Phase One of the work, which was the design and construction, and testing phase of the work. Def.'s Ex. 6 at A195. The ECP mentions nothing about deliveries in Phase One. Def.'s Ex. at 6 A195. Moreover, in oral argument, Plaintiff pointed to language in the ECP that indicates no air drop tests were required in connection with the modified sonobuoys. This language was later adopted by Mod. 4 to the '0465 Contract. Thus, the provision that Defendant relies upon did not

---

**12.** In an unpublished opinion on December 19, 2002, the Court struck the declaration of Mr. Ralph C. Nash; thus, any references to Mr. Nash's declaration by Mr. Boyle are considered stricken from the record.

apply to the modified buoys, as it did to the remainder of the buoys delivered under '0465 Contract. Tr. II at 65–66; Def.'s Ex. 6 at A195. Likewise, Modification P00009 to the '0465 Contract, which authorized an additional amount of $96,000 to be paid for work under the ECP, states that the change to "[i]ncorporate dual depth operation capability in AN/SSQ–53 sonobuoy" was "to be incorporated into *300* sonobuoys." Def.'s Ex. 3 at A19 (emphasis added). Hence, the Court is unable to find any language in the relevant provisions of the contract dealing with the ECP, or in the ECP itself, that suggests the 35 sonobuoys used for design and testing were to be considered deliveries under the '0465 Contract. Rather, the 35 sonobuoys were engineering models constructed in connection with the sale and tested with Navy assistance. Viewing the underlying facts in a light most favorable to Sparton, the nonmoving party, the Court finds that the use of the 35 sonobuoys were not deliveries under the '0465 Contract.

■ Nevertheless, delivery is not required in order for the on sale bar to apply, but rather only the existence of a sales contract prior to the critical date. *Buildex Inc. v. Kason Indust., Inc.*, 849 F.2d 1461, 1464 (Fed.Cir.1988) ("It is not necessary that a sale be consummated for the bar to operate. Even if no delivery is made prior to the critical date, the existence of a sales contract or signing of a purchase agreement prior to that date has been held to demonstrate an 'on sale' status for the invention.") (citations omitted). In *Buildex*, the Federal Circuit said proof of delivery would have been conclusive in that case, but not necessary to find the device was on sale before the critical date. *Id.*

Under general contract law principles, neither party seems to contest that the '0465 Contract and the modification thereto was a valid procurement contract. Mod. 4 was accepted and it adopted the changes described in the ECP on July 13, 1971. The critical issues in the present case are whether the patented inventions are the subject matter of the Mod. 4/'0465 Contract, and what effect does further development of the dual depth deployment design after the offer for sale,

but before the critical date, have on the alleged on sale bar. There is undisputed evidence in the record showing further development of the dual depth design after the Mod. 4 was adopted on July 13, 1971. For example, the first technical drawing of the release plate described by Sparton's patented inventions was not introduced until October 1971 and was not incorporated into the device until November 1971. Thus, on these facts, the Court considers whether the invention was the subject of a commercial offer for sale.

### C. The Subject Matter of the Mod.4/ '0465 Contract

■ With regard to whether the product itself is the subject of the commercial offer for sale, an invention may be placed on sale even when the seller does not "appreciate" that its invention has the claimed characteristics. *Scaltech III*, 269 F.3d at 1330. Logic dictates, however, that a device that does not completely exist cannot be the subject of an offer for sale. Thus, in *Pfaff*, the Supreme Court rejected the Federal Circuit's view that an invention which is only *substantially complete* can be the subject of a commercial offer or sale. The Supreme Court said that "the word 'invention' must refer to a concept that is complete, rather than merely one that is 'substantially complete.'" *Pfaff*, 525 U.S. at 65–66, 119 S.Ct. 304. In *Robotic Vision Sys., Inc. v. View Eng'g, Inc. ("Robotic Vision IV")*, the Federal Circuit recognized that "the rules have thus changed," and that the word "invention" of section 102(b) requires "complete *conception*." 249 F.3d 1307, 1312 (Fed.Cir.2001). In the context of priority of invention, conception has been described as "the touchstone of inventorship, the completion of the mental part of invention." *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1227 (Fed.Cir. 1994). Conception is the "formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." *Burroughs*, 40 F.3d at 1228 (citations omitted). Conception requires "both the idea of the invention's structure and possession of an operative method of making it." *Amgen, Inc. v. Chugai Pharm. Co., Ltd.*, 927

F.2d 1200, 1206 (Fed.Cir.1991). For conception to occur, the inventor must have a "solution to the problem at hand," and must be able to describe his invention "with particularity." *Burroughs*, 40 F.3d at 1228. Nevertheless, the Federal Circuit has explained that the "inventor need not know [the] invention will work for conception to be complete. He need only show that he had the idea; the discovery that an invention actually works is part of its reduction to practice." *Burroughs*, 40 F.3d at 1228 (citations omitted). In *Robotic Vision IV*, the Federal Circuit explained, "the test for determining whether [the] invention is complete also requires proof that the invention was enabled prior to the critical date." *Robotic Vision IV*, 249 F.3d at 1313 (citing *Pfaff*, 525 U.S. at 67, 119 S.Ct. 304). "A bare conception that has not been enabled is not a completed invention ready for patenting." *Space Sys./Loral, Inc. v. Lockheed Martin Corp.*, 271 F.3d 1076, 1080 (Fed.Cir.2001). Thus, an invention that is on sale must be a complete concept that is ready for patenting.

The Government concedes, and the parties do not dispute, that the release plate mechanism described in the '120 and '233 patents is not the release plate that was part of the original design proposed in the ECP; in other words, the Mod. 4/'0465 Contract does not include a release plate that meets the description of the release plate limitation of the claimed inventions. Def.'s Supp. Br. at 3. The evidence in this regard is undisputed; Sparton has provided the affidavits of Mr. Widenhofer and Mr. Depew to support its position that the ECP does not contain the claimed release plate. Pl.'s Ex. at 161.

Nevertheless, Defendant contends that based on general contract law principles, the release plate is part of the sale, even though drawings of the actual release plate used in the claimed device were not introduced until after the offer for sale. Defendant denies that modification was necessary to encompass the claimed inventions. Defendant ar-

gues that the UCC applies, and that the 300 sonobuoys delivered under the contract, which included the Widenhofer release plate described in the patents at issue, were conforming goods under the contract (citing UCC § 2–106(2)). Defendant asserts that the ECP and Mod. 4 did not specify the design of the release plate. Thus, Defendant contends that "[e]ven if the release plate had not been designed at the time the contract was entered, the sonobuoys conformed to the description of the goods contained in the contract ...." Def.'s Supp. Br. at 8. Defendant says the description of the sonobuoys in the contract was merely 335 sonobuoys with dual depth capability; the release plate was not significant to the overall sonobuoy design described in the ECP, and was only a passing reference. Def.'s Reply at 4; Def.'s Supp. Br. at 8.

■ Sparton contests these points and argues that the patented inventions were never part of the offer for sale because the '0465 Contract does not encompass each limitation of the claimed inventions or render them obvious. *See e.g., Tec Air Inc. v. Denso Mfg. Mich. Inc.*, 192 F.3d 1353, 1358 (Fed.Cir. 1999) (holding that the one challenging the patent must in part show "that the subject matter of the sale or offer to sell fully anticipated the claimed invention or would have rendered [it] obvious by its addition to the prior art."). In so arguing, Plaintiff points specifically to the release plate limitations of the claimed inventions. Pl.'s Opp. at 23.

As a threshold matter, Plaintiff's suggestion that every limitation of the claimed invention must be found within the language of the offer simply is not the law. Although the Federal Circuit recognized in *Scaltech II* that "the 'invention,' which has been offered for sale must, of course, be something within the scope of the claim," 178 F.3d at 1383, the Court noted, however, that "there is no requirement that the offer specifically identify these limitations." *Scaltech II*, 178 F.3d at 1383.[13] This premise was reemphasized in

---

13. The Court notes that in *RCA Corp. v. Data Corp.*, the Federal Circuit said "[t]hat the offered product is in fact the claimed invention may be established by any relevant evidence, such as memoranda, drawings, correspondence, and tes-

timony of witnesses." *RCA Corp.*, 887 F.2d 1056, 1060 (Fed.Cir.1989) (finding "bid documents themselves contain a technical description which is sufficient to identify the [invention], albeit not set forth in the language of the claims

*Scaltech III,* wherein the Court found the inventor's patented invention was on sale when its seller offered to treat hazardous waste using a process that "inherently" satisfied all the limitations of the patent claims prior to the critical date. *Scaltech III,* 269 F.3d at 1330.

Likewise, the Federal Circuit found a valid offer for sale in *Sonoscan, Inc. v. Sonotek, Inc.,* 936 F.2d 1261 (Fed.Cir.1991). In *Sonoscan,* the patent holder argued that its price quotations did not offer the patented invention, but the Federal Circuit disagreed and affirmed the district court's interpretation of the evidence to conclude that a price quote was a valid offer for sale even when the price quote did not refer to an element that was recited in the issued apparatus claim. *Sonoscan, Inc.,* 936 F.2d at 1263. The district court also looked to a post-critical date sale of the invention to conclude that it was adequately developed before the critical date.[14] Also in *Pfaff,* the very case that set more precise guidelines for the section 102(b) analysis, the Court focused on the detailed engineering drawings that described the design, the dimensions, and the materials before the critical date, which Pfaff sent to the manufacturer, rather than the "sketch" of his concept that he showed to Texas Instruments, the buyer, in connection with the offer. *Pfaff,* 525 U.S. at 57–58, 119 S.Ct. 304. There is no mention whether this "sketch" contained every limitation of the claimed invention nor was this the focus of the inquiry. *Id.* Rather, the Court's focus was on the detailed drawings which he sent to the manufacturer prior to the critical date, which drawings the Court found embodied the invention. *Id., see also Pfaff v. Wells Elecs., Inc.,* 124 F.3d 1429, 1434 (Fed.Cir.1997). Therefore, the fact that the ECP did not identify with particularity all limitations of

the claims does not mean that the inventions were not ultimately the subject of the offer for sale.

Second, general contract law principles support the notion that Sparton's inventions were the subject of the offer for sale and fall within the scope of the claims of the '120 and '233 patents. Defendant points out that the sonobuoys finally delivered conformed to the description of the goods in the contract (335 sonobuoys with dual depth capability) and that the Navy accepted Sparton's performance under the contract. Def.'s Ex. 6 at A183; Def.'s Ex. 3 at A22. There is nothing in the record to suggest that Sparton failed to perform its obligations under the contract. The Court can safely assume, therefore, that Sparton provided the 35 sonobuoys prior to the critical date and 300 sonobuoys after the critical date in the good faith belief that the buoys were provided according to the terms. Because the Federal Circuit has asked district courts to look at contract law principles as generally understood to determine whether a commercial offer or sale occurred prior to the critical date, *Group One, Ltd.,* 254 F.3d at 1047, the Government has argued that based on those same principles, the Mod 4./'0465 Contract can be construed to encompass the inventions. For example, under general principles of contract law, Defendant points out that Sparton's performance under the '0465 would satisfy the terms of the Mod. 4/'0465 Contract. Defendant argues that because the ECP did not specify the design of the release or release plate assembly, the UCC would allow Sparton to substitute any release plate that would perform the function as described in the ECP; the sonobuoys would be considered conforming goods under the contract. Def.'s Supp. Br. at 8–9 (citing UCC § 2–106, 2–311).[15] Furthermore, De-

in haec verba.") (overruled on other grounds, *Pfaff,* 525 U.S. at 67, 119 S.Ct. 304). Although the Federal Circuit's reliance on communications which did not rise to the level of a *commercial* offer for sale in the 102(b) context was misplaced, *Group One, Ltd.,* 254 F.3d at 1047–48; *Linear Technology,* 275 F.3d at 1048, its opinion concerning the language of the offer has been relied upon for the proposition that there is no legal requirement that the offer for sale specifically identify all claim limitations of the patented invention. *Scaltech II,* 178 F.3d at 1383 (citing

*Sonoscan, Inc.,* 936 F.2d at 1263, and *RCA Corp.,* 887 F.2d at 1060).

14. Although *Sonoscan* was decided pre-*Pfaff,* the principle it stands for was relied upon in *Scaltech II,* a post-*Pfaff* decision, 178 F.3d at 1383.

15. UCC § 2–311 provides, "[a]n agreement for sale which is otherwise sufficiently definite (subsection (3) of Section 2–204) to be a contract is not made invalid by the fact that it leaves particulars of performance to be specified by one of the

fendant says that under the UCC,[16] this was a contract for future goods, and by its production of the sonobuoys with the final release plate, Sparton's duty would be considered discharged pursuant to the terms of the contract because the Navy accepted the sonobuoys upon delivery. Def. Supp. Br. at 9 (citing the Restatement (Second) of Contracts § 278).[17]

Although the UCC is generally not applicable to federal government contracts, the UCC serves as a useful guide in understanding general contract principles, as does the Restatement of Contracts. *Hughes Communications Galaxy, Inc.*, 271 F.3d at 1066. The principles cited by the Government are thus helpful to the Court for purposes of understanding Sparton's performance under the contract, and how it comported with the terms of the Mod. 4/0465 Contract. Since under contract law principles as they are generally understood, the contract can be construed to encompass the embodied inventions, these principles support Defendant's position that Sparton's inventions were offered for sale before the critical date.

## D. The Development of the Deployment Design After the Offer for Sale

Nevertheless, even though the contract at issue could be construed to encompass the inventions under general contract law principles, and the ECP need not describe every limitation of the inventions with particularity, an invention that is not a complete concept cannot implicate the on sale bar under *Pfaff*. Therefore, the Court cannot examine whether the sonobuoy deployment design offered for sale satisfies all claim limitations until it considers the effect of further development of the release plate after the offer for sale.

By September 1970, Sparton began work on the sonobuoy's dual depth deployment design and proposed a schedule for constructing and testing the sonobuoys. Def.'s Ex. 8 at A199. Changes to the mechanical design were being evaluated in the lab. *Id.* By February 26, 1971, the invention was undergoing testing, and Sparton's alleged offer for sale was made thereafter in March 1971. With regard to the Widenhofer release plate, by December 1970, Mr. Widenhofer prepared notes entitled "Patent Information On a Float Pressure Activated Release Plate," Def.'s Ex. 10 at A205.[18] *Id.* The notes include sketches of the buoy with a "release mechanism" and "release plate asst." Def.'s Ex. 10. Nevertheless, based on the record evidence, drawings of the float activated release plate in its current form were not introduced until October 1971, after the offer for sale. The parties have stipulated that conception of the release plate did not occur until then.

---

parties. Any such specification must be made in good faith and within limits set by commercial reasonableness."

**16.** UCC § 2–106(1) provides, "[i]n this Article unless the context otherwise requires 'contract' and 'agreement' are limited to those relating to the present or future sale of goods. 'Contract for sale' includes both a present sale of goods and a contract to sell goods at a future time. A 'sale' consists in the passing of title from the seller to the buyer for a price (section 2–401)."

**17.** The Restatement (Second) of Contracts § 278(1)states "[i]f an obligee accepts in satisfaction of the obligor's duty a performance offered by the obligor that differs from what is due, the duty is discharged."

**18.** It describes the release plate as follows:

A release plate is a device which serves to retain the stowed components inside a common housing during storage, shipment and air

decent. On water entry, however[,] it is caused to release and fall clear of the housing allowing the various components to deploy. Conventional release plates are activated by water impact. For this reason they are sometimes referred to as water impact plates. This type of release plate has been used for many years on almost every type of sonobuoy designed to date ... The float pressure activated release plate mechanism operates on a different principle. Any sonobuoy using an installed floatation device uses a pressured gas system incorporating a flexible air tight fabric bag or float which is stowed folded in a compartment at the "top" end of the sonobuoy. A sea water battery actuates an explosive device which mechanically punctures a gas cylinder ... this gas inflates the float. [A] release mechanism is located in the housing directly above the stowed float. The pressure from the gas when the inflation device is activated will provide a large directed force which may be applied to cause the release mechanism to operate and literally be blown out of the top end of the sonobuoy.

Likewise the parties do not dispute that the ECP described and depicted a release plate, different from the design that was thereafter perfected by Mr. Widenhofer. Hence, the Court must assess whether Widenhofer's perfection of the sonobuoys' release plate after the alleged offer for sale destroys a potential on sale bar of the inventions at issue.

The Federal Circuit has recognized that development of the invention after the offer for sale but prior to the critical date raises the on sale bar. In *Robotic Vision Sys., Inc. v. View Eng'g, Inc.*, 112 F.3d 1163 (Fed.Cir. 1997) ("*Robotic Vision II*"), the Federal Circuit said, "Completion of the invention prior to the critical date, pursuant to an offer to sell that invention would validate what had been theretofore an inchoate, but not yet established bar." [19] *Robotic Vision II*, 112 F.3d at 1168. Although *Robotic Vision II* dealt with the second prong of *Pfaff*, it illustrates that an offer or sale of a particular device cannot be viewed in isolation irrespective of the invention's subsequent development made pursuant to that offer for sale. The Federal Circuit reaffirmed that notion in *Robotic Vision IV*, a post-*Pfaff* decision, when it cited the language in *Robotic Vision II* quoted above. *Robotic Vision IV*, 249 F.3d at 1313. With *Robotic Vision's* reasoning in mind, the Court turns to whether the subject of the offer for sale has to be a complete concept that is ready for patenting at the time of the offer or sale.

In *Pfaff*, the Supreme Court rejected the notion that an invention that is the subject of a commercial offer for sale has to be reduced to practice prior to the critical date. *Pfaff*, 525 U.S., at 63, 119 S.Ct. 304. Rather, the Supreme Court said the invention must be "ready for patenting." *Id.* at 66, 119 S.Ct. 304. The ready for patenting prong is "satisfied in at least two ways: by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descrip-

tions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Pfaff*, 525 U.S. at 67–68, 119 S.Ct. 304. The Supreme Court counseled that "it must be 'clear that no aspect of the invention was developed after the critical date.'" *Space Sys./Loral, Inc.*, 271 F.3d at 1079 (citing 525 U.S. at 68, n. 14, 119 S.Ct. 304). Moreover, "a bare conception that has not been enabled is not a completed invention ready for patenting ...." *Id.* at 1080.

As the Court has stated, the Federal Circuit said in *Tec Air, Inc.*, that the subject matter of the sale or offer to sell must fully anticipate the claimed invention or would have rendered it obvious by its addition to the prior art. *Tec Air, Inc.*, 192 F.3d at 1358. The Federal Circuit said "if this subject matter anticipates the claimed invention or would have rendered it obvious, the invention itself must also have been 'ready for patenting' *at the time of the offer or sale* ...." *Id.* (citing *Pfaff*, 119 S.Ct. at 312) (emphasis added). Similarly, other Federal Circuit opinions have analyzed whether the invention that was the subject of the offer was ready for patenting at the time of the sale. *See e.g., Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1355 (Fed.Cir. 2002) (directing the district court to assess "whether the second prong of the *Pfaff* test, the 'ready for patenting' prong, was met *at the time the sales were made*.") (emphasis added); *Space Sys./Loral, Inc. v. Lockheed Martin Corp.*, 271 F.3d 1076, 1080–81 (Fed. Cir.2001) ("As we have observed, the [Supreme] Court recognized this distinction when it stated in *Pfaff* that the on sale bar does not arise when there is 'additional development *after the offer for sale*.'") (emphasis added). Nevertheless, in *Allen*, as Defendant points out, the court's language is limited to the facts in that particular case, where there was no evidence of development after the offer or sale, but before the critical date.[20] *Likewise*, in *Space Systems*, the in-

---

19. *Robotic Vision II* was decided under the "substantially complete" standard rejected in *Pfaff*. *Robotic Vision II*, 112 F.3d at 1167–68.

20. For persuasive authority, Plaintiff cites Judge Allegra's opinion in *Chemical Separation Tech.,*

*Inc. v. United States*, 51 Fed.Cl. 771 (2002), to support its view that an invention must be "ready for patenting" at the time of the offer for sale. Although the opinion does inquire under the *Pfaff* test whether the invention must be ready for patenting "at the time of that sale or offer for

vention continued to be developed for months after the critical date. *Space Systems*, 271 F.3d at 1078–79. Moreover, the Federal Circuit was quoting the Supreme Court to demonstrate that "the fact that a concept is eventually shown to be workable does not retroactively convert the concept into one that was 'ready for patenting' at the time of conception." *Space Systems*, 271 F.3d at 1080 (citing *Pfaff*, 525 U.S. at 68 n. 14, 119 S.Ct. 304). *Space System's* interpretation of *Pfaff* is not inconsistent with the Federal Circuit's decisions in *Robotic Vision II* and *IV*, wherein the Federal Circuit found that additional development after the offer for sale would validate the offer for sale at the time in which the invention was *finally complete*, not at the time of the offer.

Defendant argues that the offer for sale and the completion of the invention so that it is ready for patenting do not have to occur simultaneously, rather Defendant contends that based upon *Robotic Vision II & Robotic Vision IV*, an inchoate offer is validated at the time of completion of the invention. Tr. II at 14–15. The Government relies on *Robotic Vision II*, for the proposition that completion of an invention before the critical date pursuant to a previous offer for sale of the invention creates a bar on the date of completion. Defendant is relying on work post-ECP leading up to the completion of the release plate, which Defendant argues created a statutory bar because the completed inventions were on sale prior to the critical

date. In contrast, Plaintiff contends that the invention must be ready for patenting at the time of the offer for sale, and *Robotic Vision* does not apply because it dealt with the second prong of *Pfaff* and not the first prong.

In *Robotic Vision IV*, the Federal Circuit found the on sale bar applied to the patentee's invention when there was a prior commercial offer for sale and a subsequent enabling disclosure "that demonstrated that the invention was ready for patenting prior to the critical date." *Robotic Vision IV*, 249 F.3d at 1313. The panel relies on *Robotic Vision II*, whereby the Federal Circuit explained "[c]ompletion of the invention prior to the critical date, pursuant to an offer to sell that invention, would validate what had been theretofore an inchoate, but not yet established, bar." *Robotic Vision II*, 112 F.3d at 1168. In *Robotic Vision II*, the Federal Circuit recognized that finalization of a software program "essential to the substantial completion of the device"[21] if completed prior to the critical date would validate the original offer for sale as of the date of completion, not the date of the offer. *Id.* Judge Lourie reasoned that "[i]f [completion of the invention] did occur prior to [the critical] date, it clearly cannot be considered in isolation from the alleged offer . . . ." *Id.* Thus, as the Court understands it, while the invention must be the subject matter of the offer or sale, it may not in every case be ready for patenting at the time of the commercial offer for sale due to further develop-

---

sale," *Chemical Separation*, 45 Fed.Cl. 513 517 (1999), 51 Fed.Cl. at 804, as in *Allen*, it is clear that Judge Allegra did not have before him a case which raised the issue of an invention developed further after the offer for sale, but before the critical date. Evidence of further development after the offer was explicitly discredited. *Chemical Separation Tech., Inc.* 51 Fed.Cl. at 806 ("experimentation was necessitated not by the need for additional development of the process' chemistry, but rather by the fact that the [invention at issue] had been damaged or altered after its initial installation.") Furthermore, the court in *Chemical Separation* recognizes that the two prongs of *Pfaff* are distinct inquiries, which is consistent with this Court's reasoning in the present case and contrary to Plaintiff's position. *Chemical Separation*, 45 Fed.Cl. at 518 n. 9 (stating "it appears conceivable that an inventor could sell or lease an invention for profit prior to the time the invention was fully developed. Indeed, this theoretically possibility must exist lest

the two prongs of the *Pfaff* test converge into one—whether the invention was for sale commercially.").

21. Under *Pfaff*, the invention that is the subject of the offer for sale must be a complete concept, rather than "substantially complete," which was the standard when *Robotic Vision II* was decided. *Pfaff*, 525 U.S. at 65–66, 119 S.Ct. 304. Nevertheless, the distinction is irrelevant for purposes of the Court's analysis. In *Robotic Vision II*, the Federal Circuit found a software program that had been completed after the offer for sale was necessary to make the invention "substantially complete," even though, as the Court acknowledged, it was not a part of the claims; thus, under this same logic, the program must have been essential to make the invention complete, a more rigorous requirement. *Robotic Vision II*, 112 F.3d at 1167.

ment after the offer but before the critical date. This circumstance according to *Robotic Vision II & IV,* would still implicate the on sale bar at the time of the invention's completion.

The panel's reasoning in *Robotic Vision II & IV* is consistent with *Pfaff's* requirement that in prong two, the Court consider whether the inventions at issue were ready for patenting before the *critical date.* Both prongs of the *Pfaff* test have significance. In *Tec Air,* 192 F.3d at 1358, the Federal Circuit recognized that an invention that was the subject of a commercial offer for sale in prong one, would be by nature "ready for patenting" if it fully anticipated the invention at the time of the sale. *Tec Air,* 192 F.3d at 1358 ("If this subject matter [of the sale or offer for sale] anticipates the claimed invention or would have rendered it obvious, the invention itself must also have been 'ready for patenting' at the time of the offer or sale"—e.g., the invention must have been reduced to practice or embodied in "drawings or other descriptions ... that [are] sufficiently specific to enable a person skilled in the art to practice the invention."). Nevertheless, the Supreme Court rejected a similar rule proposed by the Solicitor General in *Pfaff* in favor of its own two-prong test:

> The Solicitor General has argued that the rule governing on-sale bar should be phrased somewhat differently. In his opinion, "if the sale or offer in question embodies the invention for which a patent is later sought, a sale or offer to sell that is primarily for commercial purposes and that occurs more than one year before the application renders the invention unpatentable ..." It is true that evidence satisfying this test might be sufficient to prove that the invention was ready for patenting at the time of the sale if it is clear that no aspect of the invention was developed after the critical date. However the possibility of additional development after the offer for sale in these circumstances counsels against adoption of the rule proposed by the Solicitor General.

*Pfaff,* 525 U.S. at 68, n. 14, 119 S.Ct. 304. The Supreme Court recognized that additional development of the invention, which occurred after the offer, would make the proposed test unworkable. Thus, the Supreme Court counseled that one must determine whether the invention was ready for patenting prior to the critical date. *Id.* at 68, 119 S.Ct. 304. Evidence of development after the critical date would destroy the on sale bar. For example, in a recent case out of the Northern District of Texas, the district court could not render summary judgment in favor of the challenger to the patent because there was a material fact as to whether there was further development of the invention after the critical date. *Harris Corp. v. Ericsson Inc.,* 194 F.Supp.2d 533, 547 (2002) ("While Ericsson contends that the Reports only indicate changes *in addition to,* rather than *in place of* the initial plan, genuine issues regarding that fact remain ... whether, after the critical date, Harris designed a new 'acquisition' strategy, one that went beyond mere equalization to synchronization of information, not originally contemplated by the CECOM contract, is a crucial fact question.").

Therefore, based on the Supreme Court's reasoning in *Pfaff* and the guidance provided by the Federal Circuit in *Robotic Vision Systems II* and *IV,* Defendant's argument appears to be the stronger one. While an invention that is the subject of an offer for sale must be a complete concept and ready for patenting at the time of the sale, further development of the invention after the offer, but before the critical date will validate an "inchoate, but not yet established bar." *Robotic Vision II,* 112 F.3d at 1168. The Court does not believe that this principle is inconsistent with later panel decisions suggesting that an invention must be ready for patenting at the time of the sale because the Circuit was not presented with facts similar to the present case, where development of the invention occurred after the offer for sale, but prior to the critical date. For example, *Tec Air* is not helpful to Plaintiff's argument. In that case, the jury found that Tec Air did not make the invention or disclose the method of making the invention until after the critical date. *Tec Air Inc.,* 192 F.3d at 1359. In the present case, however, Sparton provided the Navy with the sonobuoys and the patented release plate prior to the critical date. It is

clear that a test of the device was conducted on November 5, 1971 (mechanical buoys only) and March 9, 1972; the March 9 test served as a basis for the release of the sonobuoys design by the inventor, Widenhofer. Def.'s Ex. 25; Def.'s Ex. 31 (describing the test as "very successful," which was "used as the basis of releasing the design for production of the 300 deliverable buoys."). Widenhofer indicated in his report that he was satisfied with the basic design concept. Def.'s Ex. 31 at A351, A375.

To the extent that later panel precedent upsets the principles set forth in *Robotic Vision II*, the Court must follow *Robotic Vision II*,[22] the precedent earlier in time, to conclude that the invention need not be ready for patenting at the time of the offer for sale. The Federal Circuit "has adopted the rule that prior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned *in banc*." *Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 765 (Fed.Cir.1988) (citing *UMC Elecs. Co. v. United States*, 816 F.2d 647, 652 (Fed.Cir.1987), *overruled on other grounds*, *Pfaff*, 525 U.S. 55, 119 S.Ct. 304).

Likewise, an early panel decision in *Envirotech Corp. v. Westech Engineering, Inc.*, does not help Plaintiff. In *Envirotech*, the seller offered a different design, and then intended to substitute the patented invention if it got the contract. The inventor did not exploit the actual invention until after the critical date, thus the Court found that the on sale bar did not apply. *Envirotech*, 904 F.2d at 1574–75. In the present case, Sparton's design always included a release plate, however, the release plate was further developed and completed before the critical date. Furthermore, the completed inventions were provided to the Navy prior to the critical date for drop tests in accordance with the BCP/Mod. 4.

### E. Ready For Patenting

■ Based on the record evidence, the Court concludes that Sparton's inventions were the subject of the offer for sale at issue because under *Pfaff*, they were a "complete concept" and ready for patenting prior to the critical date. *See Pfaff*, 525 U.S. at 66–67, 119 S.Ct. 304. The March 17, 1971 ECP describes the change to the AN/SSQ–53 sonobuoy as "[i]ncorporation of [d]ual [d]epth [c]apability." Def. Ex. 6 at A 183. It detailed the dual depth sonobuoy deployment design which included a release plate, however, the drawings of the plate are not identical to those of the patented inventions. The work done thereafter perfected the inventions so that they were "ready for patenting" prior to the critical date. For example, July 20, 1971 correspondence in connection with the work performed under the ECP indicates that Sparton sought to "simplify" the design of the release plate. Def. Ex. 20, at A271. Widenhofer developed such a release plate; it was tested and substituted for the existing release plate before the critical date. Thereafter, more testing was done, and from those tests Mr. Widenhofer determined that the invention—including the release plate—worked for its intended purpose before the critical date. Samples of the device meeting the descriptions of the ECP were tested with Navy assistance pursuant to the terms of the offer.

■ Plaintiff contends that the sonobuoy deployment design, including the release plate, could not be ready for patenting because production drawings of the device had not yet been prepared. Plaintiff says that the drawings are necessary in the sonobuoy industry in order for the contractors to produce the sonobuoys in quantity. Pl.'s Opp. at 34. Nevertheless, the fact that production drawings were not completed before the critical date does not change the analysis. The inventor need only be able to prepare an enabling disclosure, or an adequate description of the invention under 35 U.S.C. § 112. *Space Sys.*, 271 F.3d at 1080. "To be enabling, the specification of a patent must teach those skilled in the art how to make

22. Although *Robotic Vision II* was decided before *Pfaff*, when an invention that was offered for sale need only be "substantially complete" at the time of the sale, the change in the law to more precise standards does not disrupt the Federal Circuit's holding with respect to the development of the invention prior to the critical date. *Robotic Vision's* reasoning was relied upon in *Robotic Vision IV*, a post-*Pfaff* decision.

and use the full scope of the claimed invention without undue 'experimentation.'" *Id.* (quoting *Genentech Inc. v. Novo Nordisk A/S,* 108 F.3d 1361, 1365 (Fed.Cir.1997)). The detailed description of the sonobuoy deployment design in the ECP coupled with the detailed drawing of the Widenhofer release plate meet this requirement. Moreover, there is additional evidence in the record that supports a finding that an adequate description of the inventions existed. For example, Sparton's Engineering Department was to begin work with operations on March 6, 1972, to provide first piece samples of the sonobuoy deployment device. Toward that end, materials to construct the units to be delivered under the ECP had been ordered by the material control department of the Jackson, Michigan plant by February 28, 1972. Def. Ex. 29. Pl.'s SOF 81. Hence, Sparton was confident it could begin constructing sonobuoys with the deployment design at issue before the critical date based on the drawings that existed at that time.

Moreover, a similar argument that the patented device was not "ready for patenting" prior to the critical date was rejected in *Weatherchem Corp.;* when the inventor made modifications to the molds of his device that he characterized as "fine tuning" for "acceptable cap performance." The Federal Circuit found the invention was ready for patenting based on an early drawing that provided an enabling disclosure. *Weatherchem Corp.,* 163 F.3d at 1334 ("This record evidence shows that the invention was ready for patenting at the time of its depiction in the 2–8–85 drawing, even though Weatherchem continued to fine-tune features not claimed in the patent."). Thus, the final production drawings of the invention are not necessary as long as the existing drawings enable a person skilled in the art to practice the invention. Since engineering was starting the production of first piece samples of the sonobuoy deployment design pursuant to the contract, the record evidence supports a finding that the sonobuoy deployment design was ready for patenting prior to the critical date.

**F. Reduction to Practice**

■ Although reduction to practice of an invention is not necessary in every case to show that an invention is "ready for patenting," it is one way to demonstrate the invention was "ready for patenting" prior to the critical date. *Space Systems,* 271 F.3d at 1080; *Robotic Vision IV,* 249 F.3d at 1313. Viewing the facts in a light most favorable to Sparton, the Court finds there is evidence in the record that establishes the inventions were reduced to practice before the critical date.

A reduction to practice requires that the invention is "suitable for its intended purpose." *Scott v. Finney,* 34 F.3d 1058, 1061 (Fed.Cir.1994). For a reduction to practice to occur, there is no requirement that an invention be in a "commercially satisfactory stage of development." *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.,* 731 F.2d 831, 838 (Fed.Cir.1984). Sparton's argument that final production drawings of the sonobuoy deployment design were not available until much later does not dissuade the Court from concluding that its inventions were reduced to practice. Even if modifications were made to the deployment design after the critical date, the Court's conclusion would be the same, as long as no changes were made concerning the limitations in the claims. *Id.* at 838.

The Court rejects, however, the Government's argument that the inventions were reduced to practice any earlier than the March 9, 1972 test. The Government argues that the sonobuoy deployment design was reduced to practice as early as the February 28, 1971 test. The Court disagrees because the device tested did not have the claimed release plate mechanism. For purposes of summary judgment, the parties do not dispute that there was no conception of the claimed release plate until a drawing of the plate was introduced in October 1971. The first test of the release plate occurred during the November 5, 1971 testing of the invention. In the alternative, the Government argues that the device was reduced to practice by this date. The Court rejects this argument as well. Although the November 5 test examined the workings of the single part

release plate mechanism, Sparton points out that the release plate was tested in sonobuoys that did not have all the limitations of the claimed invention because sonobuoys were mechanical dummies. Pl.'s ex. 41 at B201.

Last, Defendant argues that the inventions were ready for patenting by at least March 9, 1972. The Court agrees and finds the March 9, 1972 test clear evidence of reduction to practice. The test was conducted to evaluate the performance of the dual depth sonobuoy deployment design prior to its release for the production of the 300 deliverable sonobuoys under the '0465 Contract. Def.'s Ex. 30 at A343. Mr. Widenhofer reported that the test was successful and there was "no recurrance [sic] of any problem previously encountered." Def.'s Ex. 30 at A343, A345. The test concluded the engineering test phase of the Dual Depth DIFAR Program. Mr. Widenhofer's follow-up report, dated April 28, 1972, indicated that "the basic design concepts have been shown, within the limitation of the engineering evaluation, to be reliable and producible. No changes of basic concepts are required to improve the reliability or producibility." Def.'s ex. 31 at A 375. The March 9, 1972 test was the basis for releasing the design for production of the 300 deliverable sonobuoys. Def.'s Ex. 31 at A372. The Court agrees with Defendant. The record evidence shows that Mr. Widenhofer was so confident in the performance of his deployment design that he believed it would work for its intended purpose and released the design for delivery in 300 sonobuoys thereafter. The Court has addressed Sparton's argument that the inventions were not reduced to practice because Widenhofer did not have the bearing data necessary to make the determination that the buoys worked for their intended purpose, *supra* Part II.A., and it has concluded that Widenhofer's documented confidence in his inventions refutes Sparton's argument.

### G. Sparton's Completed Inventions Were Embodied in or Obvious in Light of the Device Sold Under the '0465 Contract.

■ The Court turns to the specific claims of the '120 and '233 patents and com-

pares them to the subject matter of the inventions sold under the '0465 Contract. "To establish an on-sale bar, it must be shown that the device sold 'fully anticipated the claimed invention or would have rendered the claimed invention obvious by its addition to the prior art.'" *Allen Eng'g Corp.*, 299 F.3d at 1352 (citations omitted).

■ Defendant asserts that each limitation of the claims in both the '120 and '233 patents are invalid. Defendant has demonstrated each limitation's invalidity by record evidence including the descriptions and depiction in Sparton's ECP (Def.'s Ex. 6), Mr. Boyle's deposition testimony (Def.'s Ex. 4), an air drop test report (Def.'s Ex. 12), illustrations of the sonobuoy dual depth design and the Widenhofer release plate (Def.'s Exs. 24 & 26), and the descriptions and depictions in Mr. Widenhofer's final report (Def.'s Ex. 31). Defendant also states that Sparton's claim charts prepared in this case demonstrate that each limitation in the claimed inventions are embodied in the offer for sale. Def.'s Mot. Summ. J. at 19–23, 31–32. Plaintiff contends that Defendant has not met its burden with respect to three limitations of claims 1, 7 and 8 of the '120 patent, labeled (c), (e) and (f), and claims 1–3 of the '233 patent. Pl.'s Opp. at 23; Pl.'s Supp. Brief at 2–3. The Court will discuss each in turn.

The phrase labeled Limitation (c) of Claim 1 provides for a "signal receiving and transmitting apparatus within said casing slidably removable therefrom through said upper end thereof." '120 Pat., col. 6, ll. 28–30; Def.'s Mot. Summ. J. at 19. Limitation (c) of Claim 7 provides, "[a] signal receiving and transmitting apparatus removably housed within said casing slidably removable therefrom through said upper end thereof." '120 Pat., col. 7, ll. 17–19; Def.'s Mot. Summ. J. at 21–22.

Limitation (e) of Claim 1 provides for a "flexible cable means connecting said apparatus to said float means of a length determining the operating depth of said apparatus." '120 Pat., col. 6, ll. 34–36; Def.'s Mot. Summ. J. at 20. Limitation (e) of Claim 7 is the same.

Limitation (f) of Claim 1 provides "releasable retaining means mounted on said casing adjacent said upper end and intermediate said upper end and said float means retaining said float means and apparatus within said casing and permitting said float means and apparatus to deploy from said casing upper end upon said retaining means releasing from said casing." '120 Pat., col. 6, ll. 36–43; Def.'s Mot. Summ. J. at 20. Limitation (f) of Claim 7 provides "retaining means releasably mounted on said casing adjacent said upper end retaining said float means and said apparatus in said casing and releasing said float means from said casing upon said casing being immersed." '120 Pat., col. 7, ll. 1–6; Def.'s Mot. Summ. J. at 22.

With regard to limitations (c) and (e) of Claims 1 and 7, Defendant relies on Sparton's description of the limitations in their claims charts,[23] the ECP, and the testimony of Sparton's engineer, Charles Boyle.

A signal receiving and transmitting apparatus, according to Sparton "receives an acoustic signal, converts it to an electrical signal and then transmits an electrical signal through suitable electronics ... to an antenna ...." Def.'s Ex. 58 at 779. For purposes of proving infringement, Sparton describes the corresponding structure in the accused Magnavox 53A sonobuoys as a "hydrophone," which "receives acoustic signals, converts them to electrical signals, and transmits them, via a line driver in the lower electronics section ... to an upper electronics section, which contains a VHF transmitter, which transmits the signals to the antenna ...." Def.'s Ex. 58 at 791. The ECP describes the sonobuoys as containing a hydrophone; there were no changes to the subsurface electrical design of the AN/SSQ–53 sonobuoy and the hydrophone performed "under conditions equivalent to a 1500–foot depth." Def.'s Ex. 6 at A186. Thus, by Sparton's own definition, the "hydrophone" meets the elements of limitation (c), and the hydrophone was part of the device offered for sale.

Sparton argues that the Government has not met its burden with respect to limitation (e) because the portions of the record cited to by the government does not show a "flexible cable connecting the receiving and transmitting apparatus to the float means." Pl.'s Opp. at 23. Defendant replies that the description in ECP, "need only be 'sufficiently specific to enable a person skilled in the art to practice the invention.' " Def.'s Reply at 4 (citing *Pfaff*, 119 S.Ct. at 312). Defendant points to the deposition testimony of Mr. Boyle, who said that a cable could be the means of connection between the float and the electrical components below it. Def. Ex. 4 at A147–48. Sparton notes that Mr. Boyle could not conclude that a cable served this function from the picture shown to him. Pl.'s SOF ¶ 42. In Sparton's claims charts, Sparton describes the corresponding structure under 35 U.S.C. § 112 ¶ 6 as "compliant cables ... cables, wires and/or coils interconnecting adjacent components connect the transducer and electronics ... to the float envelope ... and are of a length determining the operating depth of the transducer and electronics housing ...." Def.'s Ex. 58 at 780. The corresponding structure in the accused Magnavox 53A sonobuoys, according to Sparton, is a "a flexible cable" that likewise connects the "hydrophone," and "line driver" with the "upper electronics section" which is connected by cable "to an antenna within the '[f]loatation device.' " Def.'s Ex 58 at A792. The cable is of a length determining the operating depth of the "signal ... apparatus." *Id.* Likewise, the ECP depicts 900 ft. section of cable connecting the "float, transmitter and battery" to the cable spool and more cable connects the "remainder of the buoy," which "descends at moderate speed." Def. Ex. 6 at A191. A depiction of the float, transmitter, and battery connected to the cable spool explains that "with depth selector set shallow the cable spool assembly remains attached to the floating assembly." *Id.* Moreover, Mr. Boyle testified the cable used in buoys had to be flexible, "flexible enough to permit its winding around a spool that has a diameter less than the diameter of the

---

**23.** Claims are construed the same way for purposes of validity and infringement. *W.L. Gore & Assocs., Inc. v. Garlock, Inc.,* 842 F.2d 1275,

1279 (Fed.Cir.1988). The Government is not contesting Sparton's claim construction for purposes of summary judgment.

sonobuoy housing." Def.'s Ex. 4 at A141. The ECP also describes the operation of the cable at deep and shallow depths. Def.'s Ex 6 at 188. Mr. Widenhofer's final report has similar depictions of the deployment sequence, but does not specify the length of the cable. Def.'s Ex 31 at 356–57. Based on the record, the Government has met its burden with respect to limitation (e); the record shows that the sonobuoys offered for sale encompassed the limitation.

The phrases labeled limitation (f) of Claims 1 and 7 of the '120 patent describe the release plate limitation of the sonobuoy deployment system. Def.'s Ex. 58 at A781 (Plaintiff describes corresponding structure under 35 § 112 ¶ 6 as "a single piece bendable release plate 38 . . ."); Def.'s Ex. 58 at A787 (corresponding structure is "a single piece bendable retainer plate 38 . . ."). The '233 patent describes a sonobuoy retainer plate that is used in connection with the sonobuoy deployment system recited in the '120 patent.

Claim 1 of the '233 patent describes:

[a] a retainer plate for a sonobuoy comprising

[b] a generally planar body member

[c] of deformable material

[d] having a generally circular periphery,

[e] a pair of locking tabs radially extending from said body periphery located at substantially diametrically opposed locations on said body member,

[f] and a weakened hinge line defined on said body member intermediate said locking tabs facilitating and controlling de-

formation of said body member upon a deforming force being applied to said body member transverse to the general plane thereof,

[g] said hinge line being diametrically defined on said body member on a diameter transversely related to a diameter intersecting said locking tabs,

[h] said hinge line comprises at least one elongated opening diametrically defined in said body member defining hinge portions of the material of said body member, the length of said opening being substantially perpendicular to a diameter intersecting said locking tabs.

'233 Pat., col. 6, ll. 34–51; Def.'s Mot. Summ. J. at 31–32.

Claim 2 provides:

[a] In a retainer plate for a sonobuoy as in claim 1,

[b] a pair of parachute anchor receiving slots defined in said body member periphery adjacent said locking tabs.

'233 Pat., col. 6, ll. 52–54; Def.'s Mot. Summ. J. at 32.

Claim 3 provides:

[a] In a retainer plate for a sonobuoy as in claim 2,

[b] wherein said slots are defined in said locking tabs and intersect the peripheral edge thereof.

'233 Pat., col. 6, ll. 52–54; Def.'s Mot. Summ. J. at 32.

Likewise, Claims 2–6 of the '120 patent delineate the release plate limitation.[24]

---

**24.** Claim 2 reads:
 [a] In a sonobuoy component deployment system as in claim 1 wherein said retaining means comprises
 [b] a deformable substantially flat plate having a periphery,
 [c] and locking tabs outwardly projecting from said periphery received within openings defined in said casing,
 [d] inflation of said inflatable float means deforming said plate and withdrawing said tabs from the associated casing openings.
'120 Pat., col. 6, ll. 53–60; Def.'s Mot. Summ. J. at 20.
 Claim 3 provides:
 In a sonobuoy component deployment system as in claim 2 wherein said deformable plate includes a weakened hinge line defined

thereon intermediate said locking tabs to facilitate and control deformation of said plate.
'120 Pat., col. 6, ll. 61–65.
 Claim 4 reads:
 [a] In a sonobuoy component deployment system as in claim 3 wherein said hinge line comprises
 [b] at least one elongated opening diametrically defined in said plate,
 [c] the length of said opening being substantially perpendicular to a diameter interconnecting said locking tabs.
'120 Pat., col. 6, ll. 66–68, col. 7, ll. 1–2; Def.'s Mot. Summ. J. at 21.
 Claim 5 reads:
 [a] In a sonobuoy component deployment system as in claim 2,

Sparton argues that the release plate shown and described in the '120 patent and '233 patent is not the same or a 35 U.S.C. § 112 ¶ 6 equivalent to the Depew plate depicted in the ECP. For purposes of summary judgment this is not in dispute. Furthermore, the parties agree that the first drawing of the Widenhofer release plate described in the patents was not created until after the offer for sale (in an October 1971 drawing). Nevertheless, Mr. Widenhofer's final report on the AN/SSQ–53 dual depth sonobuoy, dated April 28, 1972, described the Widenhofer release plate in detail. Def.'s Ex. 31, at A354–259. The parties agree that the release plate described in Mr. Widenhofer's final report, was "a simple one-piece stamped steel plate. The plate had a center hinge line which bent during actuation by the float. Set of tabs at opposite points on the plate circumference engaged slots in the sonobuoy housing." Def.'s SOF at ¶ 107, Pl.'s SOF at ¶ 107. In addition, "the parachute shroud line were attached to brackets which engaged slots between the sets of tabs on the release plate." Def.'s SOF at ¶ 108, Pl.'s SOF at ¶ 108. The drawing 900–4709 (dated Oct. 10, 1971) (Def.'s Ex. 24) was included in Mr. Widenhofer's final report. Def. Ex. 31 at 354. In deposition, Mr. Boyle examined an AN/SSQ–53 sonobuoy, and stated that the release plate in it appeared to conform to the plate depicted at section AA of drawing 900–4709, labeled 900–4623. He said that it is a generally circular metal plate (aluminum or steel). Mr. Boyle answered affirmatively when asked if the metal appeared "to be of the type that could conform in response to a sufficient force," but could not tell whether it was aluminum or steel. Def.'s Ex. 4 at 169–170. The release plate had tabs which were inserted into the housing on the sonobuoy.

Slots in the tabs "serve as retainers for the attachment of the shroud lines." Def.'s Ex. 4 at 172. "The shroud lines are attached to a ring which is held in place by the slots in the release plate." Def.'s Ex. 4 at 171. Mr. Boyle stated that the relationship between the line connecting the slots and hinge line would be orthogonal, which is the same concept as perpendicular. Def.'s Ex. 4 at 172.

Moreover, it is undisputed that the second illustration of the release plate (a drawing labeled 900–4623 and dated Nov. 31, 1971) similarly is generally circular, with a flat plate and a pair of locking tabs for engagement of the sonobuoys housing. Three elongated openings at the plate's diameter form a hinge line, allowing the plate to deform along the hinge line if sufficient force were applied. Def.'s SOF at ¶ 73; Pl.'s SOF at ¶ 73. "Slots within the tabs accept the bridle bracket assemblies to which the parachute shroud lines can be attached. A line connecting the slots is perpendicular to the hinge line." Id. Although Mr. Boyle did not know first hand if the release plate depicted in drawing 900–4623 was incorporated into the sonobuoys sold under the contract, he thought Widenhofer would know which release plate was used in the buoys. Def.'s Ex. 4 at A161. Mr. Widenhofer's final report describes in detail the release plate limitation and provides a drawing of the "Dual Depth DIFAR layout," drawing 900–4709. The layout is depicted in Def.'s Ex. 24 and includes an illustration of the release plate labeled 900–4623. Def.'s Ex. 31 at A354. Based on the record evidence, the release plate described in limitation (f) of Claims 1, 7, and 8 of the '120 patent and claims 1–3 of '233 patent is at the very least rendered obvious in light of the prior art,[25] which is the release plate illustrated and incorporated into the AN/SSQ–53

 [b] parachute anchor means defined on said plate,
 [c] and a parachute anchored to said anchor means for retarding the rate of descent of said casing while falling through the atmosphere and released from said casing upon said plate releasing from said casing.
'120 Pat., col. 7, ll. 3–8; Def.'s Mot. Summ. J. at 21.
 Claim 6 reads:
 [a] In a sonobuoy component deployment system as in claim 5 wherein

 [b] said anchor means are located on said plate adjacent said plate periphery and said locking tabs.
'120 Pat., col. 7, ll. 9012; Def.'s Mot. Summ. J. at 21.

25. An invention is rendered obvious under 35 U.S.C. § 103(a) "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art . . . ."

sonobuoys by Widenhofer and sold under the ECP. The same holds true for claims 2–6 of the '120 patent.

## H. The Experimental Use Exception

 The experimental use exception negates an on sale bar when an inventor uses the sale to test the claimed features of the invention. *EZ Dock Inc. v. Schafer Sys., Inc.,* 276 F.3d 1347, 1353 (Fed.Cir.2002). In determining whether the experimental use exception applies, the Court must assess whether "the transaction constituting the sale was 'not incidental to the primary purpose of experimentation,' i.e., whether the primary purpose of the inventor at the time of the sale, as determined from an objective evaluation of the facts surrounding the transaction, was to conduct experimentation." *Allen Eng'g,* 299 F.3d at 1354. Nevertheless, the fact that a particular sale was made in the context of a research and development contract does not by itself, "suffice to avoid the on-sale bar." *Zacharin,* 213 F.3d at 1370. It is not the burden of the challenger of the patent to come forward with evidence negating experimental use, rather "it is incumbent on the patent owner to come forward with evidence directed to showing an experimental purpose in order to bring that issue into the case." *Barmag,* 731 F.2d at 839. The factors that are relevant to assessing experimentation are as follows:

(1) the necessity for public testing, (2) the amount of control over the experiment retained by the inventor, (3) the nature of the invention, (4) the length of the test period, (5) whether payment was made, (6) whether there was a secrecy obligation, (7) whether records of the experiment were kept, (8) who conducted the experiment, . . . (9) the degree of commercial exploitation during testing[,] . . . (10) whether the invention reasonably requires evaluation under actual conditions of use, (11) whether testing was systematically performed, (12) whether the inventor continually monitored the invention during testing, and (13) the nature of contacts made with potential customers.

*EZ Dock v. Schafer Sys., Inc.,* 276 F.3d 1347, 1357 (Fed.Cir.2002) (Linn, J., concurring).

Although not all factors may apply in a particular case. *Allen Engineering,* 299 F.3d at 1353.

 Furthermore, "[e]xperimentation conducted to determine whether [the invention] would suit a particular customer's purposes does not fall within the experimental use exception." *Allen Eng'g,* 299 F.3d at 1355. Likewise, the experimental use exception does not apply if the invention was reduced to practice. *Allen Eng'g,* 299 F.3d at 1354 (citing *Zacharin v. United States,* 213 F.3d 1366, 1369 (Fed.Cir.2000); *RCA Corp.,* 887 F.2d at 1061). There is evidence in the record that the inventions were reduced to practice prior to the critical date, specifically by the March 9, 1972 test. Hence, the evidence suggests the experimental use exception does not apply.

Even assuming the inventions were only ready for patenting before the critical date, and not reduced to practice, the experimental use exception is still not applicable. First, as Defendant demonstrates in its brief, the Mod. 4/'0465 Contract did not specify that the sonobuoy dual depth deployment design was experimental. Moreover, in its ECP, Sparton assured the Navy that it faced little risk in adopting the ECP because the modifications had been tested. Def.'s Ex. 6 at A186 ("Some of the proposed modifications have already been proven on other sonobuoy programs. The electrical modifications are minor and are limited to the surface assembly. The subsurface electronics and hydrophone assemblies are identical to the assemblies used in the Sparton AN/SSQ–53 DIFAR Sonobuoy.")

Sparton contends that the ECP was entered into for the primary purpose of experimentation. Sparton says that the record, as well as industry custom, supports such a finding. For example, Sparton argues that it retained as much control and monitoring over the testing as it could under the circumstances. Sparton notes that the sonobuoys were expendable, and Sparton could not repair any of the sonobuoys if they malfunctioned. Moreover, Sparton needed Navy assistance to complete the testing because it did not have the resources such as air craft, submarines or Navy avionics to record the

test results. Pl.'s Supp. Br. at 8. Sparton attests that it was custom in the sonobuoy industry to provide samples for testing under actual service conditions. Nevertheless, the sea tests conducted under Phase One of the ECP were done for the benefit of the Navy; the Government paid for the Phase One testing under contract, which was completed before the critical date. In October 1971, Sparton requested an equitable adjustment for "the work being performed under the modification," which the Navy agreed to on February 1, 1973. Def. Ex. 3 at A14; Def.'s Ex. 32. Any testing done in Phase Two was conducted by the Navy under the direction of Mr. Graff, and according to Mr. Graff, Sparton did not receive routine written reports about the performance of the sonobuoys during that period. Depo. of William H. Graff, Def. Ex. 38 at A487–A488. Other persuasive evidence suggests that the experimental use exception does not apply. For example, there was no secrecy agreement between Sparton and the Navy. Sparton argues that there was a security classification built into the contract, and the manual that it provided was classified; however, the security classification was for the benefit of the Navy not Sparton, and nothing Sparton did prevented the Navy from disclosing the inventions if it so desired. Likewise, the fact that Sparton did not make a profit for the work performed under the contract and that no contracts were made with other customers does not persuade the Court that the experimental use exception applies here. Given the nature of the inventions, the type of customers who have a need for the sonobuoy deployment system is limited, and the absence of profit simply does not demonstrate experimentation. *See In re Dybel,* 524 F.2d 1393, 1401 (C.C.P.A.1975) ("Although selling the devices for profit would have demonstrated the purpose of commercial exploitation, the fact that appellant realized no profit from the sales does not demonstrate the contrary."). In sum, the facts do not support Sparton's claim that the experimental use exception negates the on sale bar.

### III. CONCLUSION

In sum, the Government has provided clear and convincing evidence that Sparton's sonobuoy deployment design was placed on sale more than one year prior to the critical date. Sparton made a commercial offer for sale of the design, which was ready for patenting before the critical date. Since Sparton was in control of the inventions described in the '120 and '233 patents, it could have sought patent protection at an earlier time or kept the inventions in house, but Sparton did not in the hope that the Navy would find its sonobuoys superior to those of its competitors. At some point the inventor must make a choice either to promptly seek patent protection in light of the commercial exploitation of his or her invention or give the invention to the public. In *Pfaff,* Justice Stevens quoted a similar principle articulated by Judge Learned Hand:

> "[I]t is a condition upon an inventor's right to a patent that he shall not exploit his discovery competitively after it is ready for patenting; he must content himself with either secrecy, or legal monopoly."

*Pfaff,* 525 U.S. at 68, 119 S.Ct. 304.

For the reasons stated herein, the Court GRANTS Defendant's Motion for Summary Judgment on the Issue of Invalidity. The Clerk is directed to enter Judgment for Defendant.